IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF IOWA
CENTRAL DIVISION

| | |
|---|---|
| ISU VETERINARY SERVICES CORPORATION, <br><br> Plaintiff, <br><br> vs. <br><br> STEVEN BRENT REIMER, DEREK NESTOR, STAN WAGNER, PAUL HANIKA, AND IOWA VETERINARY REFERRAL CENTER, <br><br> Defendants. | No. 4:11-cv-00093-JAJ <br><br><br> **ORDER** |

      This matter comes before the Court pursuant to Plaintiff Veterinary Services Corporation's February 28, 2011 Motion for Preliminary Injunction. (Dkt. No. 2). Defendants filed a Resistance (Dkt. No. 22) on March 18, 2011, and Plaintiffs filed a Reply (Dkt. No. 33) on March 29, 2011. A hearing was held over three days – March 18, 2011, April 5, 2011, and April 8, 2011. At the hearing, Plaintiff clarified that it seeks preliminary injunctive relief against only Steven Brent Reimer, Derek Nestor, and Paul Hanika. For the following reasons, Plaintiff's motion is granted with regard to Drs. Nestor and Reimer and is denied with regard to Mr. Hanika.

**I. INTRODUCTION**

      Iowa State University ("ISU") is the sole shareholder of ISU Veterinary Services Corporation ("VSC"), a non-profit corporation formed in 1987 that has held various assets for the benefit of ISU over its twenty-four-year history. This litigation relates to VSC's purchase of Iowa Veterinary Specialties, P.C. ("IVS"), a specialty veterinary clinic previously owned by 26 general practice veterinarians in the Des Moines area. ISU is home to the oldest veterinary college in the United States, and it purchased IVS – through VSC – to enhance the college's clinical education offerings.

      Here, VSC claims that IVS employees – two doctors and its operations manager –

1

violated duties of confidentiality and, in some cases, contractual non-competition obligations by starting a competing clinic called Iowa Veterinary Referral Center ("IVRC"), which opened on March 1, 2011. Specifically, Plaintiff claims that Drs. Nestor and Reimer are in violation of non-competition agreements they entered with IVS, which were later assigned to VSC pursuant to its Asset Purchase Agreement with IVS's previous shareholders. VSC also claims that Drs. Nestor and Reimer further breached those agreements by hiring IVS's operations manager, Paul Hanika, for IVRC. Finally, VSC argues that these three defendants stole confidential information from IVS to plan and execute their competing venture, breaching Drs. Nestor and Reimer's contractual duties of confidentiality and Hanika's common-law duty of loyalty. For these reasons, VSC seeks to preliminarily enjoin Defendants from operating IVRC, arguing that VSC will be irreparably harmed absent such relief.

Defendants argue that ISU is competing with private enterprise in violation of Iowa statutory law. Further, they argue that VSC cannot lawfully own a veterinary practice under Iowa's Veterinary Practice Act. And for these reasons, Defendants contend, VSC has no legitimate business interest in enforcing Drs. Reimer and Nestor's non-competition agreements. Moreover, Defendants argue that the non-competition agreements at issue are unenforceable on other grounds. Last, Defendants claim that all information accessed or retained by Reimer, Nestor, and Hanika was publicly available and therefore not subject to either contractual or common-law duties of confidentiality.

## II. Factual Background

On January 13, 2011, ISU sought permission from the Iowa Board of Regents to (1) purchase real estate from IVS; (2) approve Restated Articles of Incorporation and Bylaws of Iowa State University Equities Corporation, which shortly thereafter became Plaintiff VSC; and (3) give VSC the authority to execute an Asset Purchase Agreement, Affiliation Agreement, and a Repayment Agreement in order to acquire the assets of IVS. When asked to explain the University's reasons acquiring IVS during a January 13, 2011 Board of Regents meeting, the dean of the College of Veterinary Medicine, John Thompson, stated:

> The College of Veterinary Medicine has been on a mission to

2

> enhance and regain its academic preeminence in the United States, and this is one part of us regaining this preeminence and being able to have a visible opportunity to serve the main metropolitan area in the State of Iowa. [It] is an opportunity for us to enhance our – to expand our caseload and exposure of cases for our students; our residents and also our faculty, and it gives our faculty an opportunity to enhance the healthcare for animals through translational research and through an opportunity of real life experience in a clinic such as this.

(Def. App. 27-33). On February 1, 2011, after an extended negotiation, VSC acquired substantially all of IVS's assets through the Asset Purchase Agreement. As part of the acquisition, IVS's previous 26 shareholders agreed to exclusively refer cases to IVS for a period of years.

Defendants, Drs. Derek Nestor, Steven Reimer, and Mr. Paul Hanika were employees of IVS before VSC's ownership. Drs. Reimer and Nestor were highly compensated veterinarians at IVS, and Mr. Hanika was its operations manager. Previously, in January of 2008, Drs. Nestor and Reimer had offered to buy IVS, but the board of directors rejected their offer. Upon learning that IVS was soliciting offers to purchase the clinic in early 2010, Drs. Nestor and Reimer submitted a second offer, which was again rejected by the board of directors in favor of VSC's higher bid. Shortly thereafter, Dr. Reimer informed both IVS and VSC that he would not remain at the clinic under VSC's ownership, and he ultimately was not offered a position at IVS following the acquisition. However, VSC purchased Dr. Reimer's non-competition and confidentiality agreement and seeks to enforce it here. Dr. Nestor and Mr. Hanika continued employment with IVS under VSC's ownership.

Before VSC's ownership, both Drs. Nestor and Reimer entered non-competition and confidentiality agreements with IVS.[1] The agreements provide that they are prohibited from competing with IVS within the Des Moines metropolitan area for a period of two years. The agreements further provide that (1) they were assignable by IVS to any purchaser of the business;

---

[1] There is some dispute as to whether Dr. Reimer ever executed the non-competition and confidentiality agreement. The Court, however, finds that Dr. Reimer did validly execute the agreement, which is discussed in greater detail below.

3

(2) breach of the agreements would constitute irreparable harm to IVS justifying injunctive relief; and (3) the writings constitute the entire agreements between the parties.

When the Defendants learned of VSC's pending acquisition of IVS, they began making plans to leave IVS and open a competing veterinary clinic, IVRC, in the Des Moines area. Defendants began planning IVRC while still employed with IVS, and they used VSC's business information to plan their competing venture, including IVS's shareholder list, employee summary, referral activity, and vendor information. Dr. Nestor also negotiated a lease for IVRC while still employed with IVS. In December of 2010, Defendants Hanika, Reimer, and Nestor divided up work for IVRC's business plan using IVS's computer and email systems. IVRC's business plan identifies IVS as one of its primary competitors and includes a chart comparing IVRC and IVS on price, service, reputation, location, hours, credit policies, and methods of promotion.

Dr. Reimer's last day at IVS was January 28, 2011, and Mr. Hanika and Dr. Nestor left on February 10, 2011. On February 1, 2011 – the day VSC closed its acquisition of IVS – Defendants sent an IVRC solicitation to IVS's previous shareholders. The solicitation stated that IVRC was taking appointments and planned to open March 1, 2011. IVRC opened as planned and is in direct competition with IVS. Plaintiff presented testimony that IVS has since experienced a drop in both revenue and patients.

### III. DISCUSSION

The movant has the burden of "establishing the propriety" of preliminary injunctive relief. *Baker Elec. Co-op, Inc. v. Chaske*, 28 F.3d 1466, 1472 (8th Cir. 1994) (citing *Modern Computer Sys., Inc. v. Modern Banking Sys., Inc.*, 871 F.3d 734, 737 (8th Cir. 1989) (en banc)). In evaluating Plaintiff's motion, the Court considers the familiar *Dataphase* factors, which are: (1) plaintiff's probability of success on the merits; (2) the threat of irreparable harm to plaintiff; (3) the balance between this harm and potential harm to others if relief is granted; and (4) whether an injunction serves the public interest. *Dataphase Sys., Inc. v. C L Sys., Inc.*, 640 F.2d 109, 114 (8th Cir. 1981) (en banc). "A court should balance these considerations when deciding whether to issue an injunction." *Mid-America Real Estate Co. V. Iowa Realty Co., Inc.*, 406 F.3d

969, 972 (8th Cir. 2005) (citing *Taylor Corp. v. Four Seasons Greetings, LLC*, 315 F.3d 1039, 1041 (8th Cir. 2003)).

## A. Likelihood of Success on Merits

Although no single factor is dispositive, *Lankford v. Sherman*, 451 F.3d 496, 503 (8th Cir. 2006), the first factor – the movant's likelihood of success on the merits – is the most significant. *S&M Constructors, Inc. v. Foley Co.*, 959 F.3d 97, 98 (8th Cir. 1992), *cert. denied*, 506 U.S. 863, 113 (1992). Under this factor, the Court need not decide whether the movant will ultimately prevail but only whether it has a "fair chance of prevailing" on the merits. *Planned Parenthood Minnesota, North Dakota, South Dakota v. Rounds*, 530 F.3d 724, 732 (8th Cir. 2008). The Court first considers Plaintiff's likelihood of success against Mr. Hanika and then collectively against Drs. Nestor and Reimer because they are more similarly situated.

**1. Mr. Hanika**

Plaintiff has not demonstrated a likelihood of success on the merits sufficient to justify an injunction against Hanika, who does not have a non-competition or confidentiality agreement with IVS. Hanika was the operations manager at IVS before and after VSC's acquisition, and Plaintiff argues that he violated a common-law duty of loyalty to IVS, which he owed by reason of his "position of trust" within the partnership.

Under Iowa law, "a principal-agent relationship gives rise to a fiduciary duty of loyalty, and an employer-employee relationship can be closely associated with a principal-agent relationship." *PFS Distribution Co. V. Raduechel*, 332 F.Supp.2d 1236, 1244 (S.D. Iowa 2004) (citing *Condon Auto Sales & Serv. V. Crick*, 604 N.W.2d 587, 599 (Iowa 1999)). "An employee who is in a position of responsibility is considered [a]n agent [because the employee] usually has greater authority to act for the principal, such as negotiating contracts, while an employee typically renders services at the direction of the employer." *NCMIC Finance Corp. v. Artino*, 638 F.Supp.2d 1042, 1082 (S.D. Iowa 2009) (quoting *Condon Auto Sales & Serv., Inc.*, 604 N.W.2d at 599) (internal quotations omitted). The extent of that duty varies in relation to the employee's position within the company and the degree of confidence entrusted to him. *PFS Distribution Co.*, 322 F.Supp.2d at 1244. Always, the employer-plaintiff must show that the employee's breach provided "substantial assistance to the competitor." *Id.* This claim is viewed

5

narrowly under Iowa law. *Id.*

The evidence presented at the hearing established both that Hanika occupied a position of trust within IVS and also that – while employed there – he forwarded IVS business information to Nestor and Reimer, knowing that they were forming a competing clinic. This information related to IVS's referring doctors, its employees, vendors, and pricing of services. The Court finds, however, that Plaintiffs failed to convincingly show that Hanika's breach provided "substantial assistance" to Nestor, Reimer, and IVRC. Indeed, much of the information was obtainable publicly or was already well-known to those in the Iowa veterinary professional community. As Defendants point out, IVS's referring doctors were listed on its website, and IVS would freely estimate prices for various services over the phone. Moreover, Drs. Nestor and Reimer – as former high-level employees of IVS – were already thoroughly familiar as to any arguably confidential information provided by Mr. Hanika.

Plaintiff also argues that Mr. Hanika should be enjoined because he was hired away from IVS by Drs. Nestor and Reimer, whose non-competition agreements prohibit the poaching of IVS employees. Such a claim would be better remedied by an award of damages than an injunction against Mr. Hanika. Therefore, noting that Iowa law takes a narrow view of this claim, the Court finds that Plaintiffs have not met their burden of showing a likelihood of success on the merits as to Mr. Hanika.

**2. Drs. Nestor and Reimer**

Under Iowa law, courts "will enforce a noncompetitive provision in an employment contract if the covenant is reasonably necessary for the protection of the employer's business and is not unreasonably restrictive of the employee's rights nor prejudicial to the public interest." *NCMIC Finance Corp. v. Artino*, 638 F.Supp.2d 1042, 1068 (S.D. Iowa 2009) (quoting *Iowa Glass Depot*, *Inc. v. Jindrich*, 338 N.W.2d 376, 381 (Iowa 1983)) (internal quotations omitted). To avoid being unreasonably restrictive, non-competition agreements must be "tightly limited as to both time and area." *Id.*

Here, the parties cannot dispute the reasonableness of the scope of the non-competition agreements, which prohibit Defendants from competing with IVS for a period of two years following their termination of employment and only in the Des Moines metropolitan area. In any

event, the Court finds both the temporal and geographical limitations to be reasonable.

Defendants, however, challenge the validity of the agreements on a number of other grounds. First, Defendants argue that VSC lacks the authority bring this action under Iowa Code § 23A.2, which prevents government competition with private enterprise. Second, Defendants argue that VSC cannot lawfully own a veterinary clinic and therefore has no legitimate business interest in enforcing the non-competition agreements. Finally, Defendants argue that the non-competition agreements are unenforceable because (1) Dr. Nestor was fraudulently induced into signing it; (2) Dr. Reimer was not offered employment after VSC's acquisition; (3) IVS only selectively enforces its non-competition agreements "rendering them meaningless;" and finally (3) Defendants would be prejudiced because VSC's acquisition required Defendants to accept materially different jobs. Each argument is discussed below.

### i. Government Competition with Private Enterprise

Defendants argue that VSC is unlawfully competing with private enterprise by purchasing and operating IVS and by seeking to enforce Drs. Nestor and Reimer's non-competition agreements as part of that venture.

Iowa Code § 23A.2 prohibits government competition with private enterprise:

> 1. A state agency or political subdivision shall not, unless specifically authorized by statute, rule, ordinance, or regulation:
>
> a. Engage in the manufacturing, processing, sale, offering for sale, rental, leasing, delivery, dispensing, distributing, or advertising of goods or services to the public which are also offered by private enterprise unless such goods or services are for use or consumption exclusively by the state agency or political subdivision.
>
> b. Offer or provide goods or services to the public for or through another state agency or political subdivision, by intergovernmental agreement or otherwise, in violation of this chapter.

Iowa Code § 23A.2(1). However, as Defendants acknowledge, § 23A.2(10)(k) provides the following exceptions for "on-campus activities of an institution or school under the control of the state board of regents or a school corporation:"

> (9) Goods, products, or professional services which are produced, created, or sold incidental to the schools' teaching, research, and

7

      extension missions.

      (10) Services to the public at the Iowa state university college of
      veterinary medicine.

Iowa Code § 23A.2(k).

      Additionally, § 23A.2(2) provides that the state board of regents may, by rule, create an exemption for "[g]oods and services that are directly and reasonably related to the educational mission of an institution or school." Iowa Code § 23A.2(2)(a). Iowa Administrative Code § 681-9.4 provides additional guidance when – as here – the governmental entity at issue is a public university under control of the board of regents. Iowa Admin. Code § 681-9.4(2) (defining "Institutions under the control of the state board of regents" to include ISU). In particular, § 681-9.4(1) provides that one of the following relevant conditions must be met for approval of activities under § 23A.2(2) involving the sale of services:

> *a.* The activity is deemed to be an integral part of the institution's educational, research, public service and campus support functions, and other educational and support activities.
>
> . . .
>
> *d.* The activity is carried out due to the importance of maintaining the quality of the institution.

Iowa Admin. Code § 681-9.4(23A).

      Defendant argues that ISU's "decision to purchase IVS, including limiting the referrals of the 26 IVS shareholders, and ISU-VSC's attempt to enforce the non-compete agreements at issue in this lawsuit cannot meet any of these exceptions or exemptions." (Def's Response, 19). The Court disagrees. First, the Court notes that Defendants focus specifically on IVS's enforcement of the non-competition agreements and its limitation on referrals by old IVS shareholders to argue that its activities are unrelated to ISU's missions. This is an unfair narrowing of Plaintiff's actions. Rather, the Court considers IVS's enforcement of the agreements in the context of the IVS acquisition as a whole and ISU's aim of providing specialty veterinary clinical education to

8

its students.[2] Second, as plaintiff correctly notes, more and more veterinary schools are integrating clinical education into their curricula. (Reply at 3-4). And the Board of Regents approved the venture after Dean John Thompson explained that IVS would allow the veterinary school to "expand our caseload and exposure of cases for our students; our residents, and also our faculty." (Def. App. 27-33). As such, such satellite campus activities are squarely within the University's educational and research missions.

Defendants also argue that IVS cannot qualify under subsections (9) and (10) of §23A.2(10)(k) because it does not qualify as an "on-campus activit[y]." Again, the Court disagrees. The Iowa Supreme Court has previously held that "on-campus" – as used in § 23A.2(10)(k) – is "not restricted to a site which is contiguous with all the buildings and grounds of a university." *Net Midwest, Inc. v. State Hygienic Lab.*, 526 N.W.2d 313, 316 (Iowa 1995). Indeed, the Supreme Court stated "[a] site may be some distance from the school's main setting and still be considered 'on-campus.'" *Id.* Defendant makes much of the fact that, in *Net Midwest*, the non-contiguous university site conducted many of its activities back at the University of Iowa's main campus. By contrast, the evidence introduced at the hearing established that IVS operates predominantly at the Des Moines site without much reliance on the Ames campus for ancillary services. However, this factual distinction is insufficient to distinguish this case from *Net Midwest*. IVS is staffed by ISU faculty and staff, who serve ISU students, and ISU – through VSC – owns the land and facilities where IVS is located. IVS therefore provides "[s]ervices to the public at the Iowa state university college of veterinary medicine," *See* Iowa Code § 23A.2(10)(k)(10), and ISU is not unlawfully competing with private enterprise.

Having concluded that ISU-VSC is not unlawfully competing with private enterprise pursuant to §23A.2(10)(k), the Court need not consider whether the additional exemptions in §

---

[2] In fact, the plain language of Iowa Code § 23A.2 – prohibiting the offering of goods and services to the public which are also offered by private enterprise – would not even apply to the enforcement of employment and referral agreements, the activities upon which Defendants focus so much attention. It is only within the context of VSC's provision of veterinary services to the public that the contractual enforcement falls subject to the prohibitions of § 23A.2.

23A.2(2)(a)-(b) apply, nor whether the Regents properly approved, "by rule," the acquisition of IVS.

The Court next considers Defendants' argument that it should abstain from deciding this issue under the doctrine first established in *Burfurd v. Sun Oil Co.*, 319 U.S. 315 (1943). The Supreme Court has explained the *Burford* doctrine as follows:

> Where timely and adequate state-court review is available, a federal court sitting in equity must decline to interfere with the proceedings or orders of state administrative agencies: (1) when there are difficult questions of state law bearing on policy problems of substantial public import whose importance transcends the result in the case then at bar; or (2) where the exercise of federal review of the question in a case and in similar cases would be disruptive of state efforts to establish a coherent policy with respect to a matter of substantial public concern.

*New Orleans Public Service, Inc. v. Council of City of New Orleans*, 491 U.S. 350, 361 (1989) (quoting *Colorado River Water Conservation Dist. v. United States*, 424 U.S. 800, 814 (1976)) (internal quotations omitted). Noting that they have not yet received a final ruling in their appeal to the State Board of Regents under Iowa Admin. Code § 681-9.4(8), Defendants ask this Court to decline jurisdiction pursuant to the *Burford* doctrine above.

*Burford* abstention is inappropriate in this case. First, the Court notes the extreme rarity of the doctrine in the Eighth Circuit. *See Melahn v. Pennock Ins., Inc.*, 965 F.2d 1497, 1506 (8th Cir. 1992) (noting the doctrine of abstention "is an extraordinary and narrow exception to the duty of a District Court to adjudicate a controversy properly before it," which is justified only in "exceptional circumstances"). Here, no exceptional circumstances exist to justify abstention. Most importantly, the Court finds no "difficult question of state law . . . whose importance transcends the result in the case . . at bar." *New Orleans Public Service*, 491 U.S. at 361. The statutes at issue are neither ambiguous nor difficult to apply to the facts of this case. The Court also does not find its exercise of jurisdiction to "be disruptive of state efforts to establish a coherent policy" because the board of regents has already approved VSC's acquisition. Accordingly, the Court will not abstain under *Burford*.

**ii. VSC's Ownership of a Veterinary Clinic**

Next, Defendant argues that VSC cannot own or operate a veterinary clinic under the Iowa Veterinary Practice Act and that it therefore has no legitimate business interest in enforcing the non-competition agreements with Drs. Nestor and Reimer. Section 169.4A of that Act provides, in relevant part:

> A person, including a corporation, limited liability company, or partnership, established on or after July 1, 1994, other than either a professional corporation organized under chapter 496C or a veterinarian licensed under this chapter, shall not provide veterinary medical services, own a veterinary clinic, or practice in this state, except as otherwise provided in this chapter. . . .

Iowa Code. § 169.4A. Defendants acknowledge that VSC was formed in 1987 and that, under the plain language of § 169.4A, it is excepted from the prohibition on corporations owning veterinary clinics. However, Defendants argue that VSC should not be allowed to qualify as a pre-1994 corporation because VSC was established "for a completely different purpose than the current purpose of the newly retooled corporation." (Resistance at 29).

VSC is the corporate descendant of ISU Equities Corporation, which was formed in 1987 with the general purpose of carrying out the University's various missions. The Articles of Incorporation were amended in 1990, and the corporate purpose was then limited to "holding title to property, collecting income therefrom and turning the income over to its sole member and parent organization, the Iowa State University of Science and Technology." (App. pp. 48-49). In 2011, ISU Equities Corporation was renamed VSC, and the Articles of Incorporation were again restated to reflect VSC's purpose with regard to the College of Veterinary Medicine.[3] (Def. Ex. J).

Section 169.4A clearly states that corporations established before July 1, 1994 can own and operate a veterinary clinic. And "[w]hen a statute is plain and its meaning clear, courts are

---

[3] The corporate purpose includes, among other things: (1) "Providing Iowa State University students and resident with opportunities for experiential learning;" (3) "Providing researchers at the Iowa State University College of Veterinary Medicine with opportunities to advance the practice of veterinary medicine."

not permitted to search for meaning beyond its express terms" *State v. Iowa Dist. Court for Mahaska County*, 620 N.W.2d 271, 273 (Iowa 2000) (quoting *State v. Chang*, 587 N.W.2d 459, 461 (Iowa 1998)). Accordingly, the Court will not infer a limitation on a corporation's ability to restate its Articles of Incorporation or change its name and still qualify for exemption under the statute. VSC – as a corporation established in 1987 – can own and operate a veterinary clinic under § 169.4A. Even if Defendants were correct and VSC were prohibited from owning a veterinary clinic under § 169.4A, VSC can easily cure the problem by transferring ownership of IVS to ISU. Consequently, Defendants' argument – even if successful – would have little impact on Plaintiff's likelihood of success on the merits. Finally, the Court also notes that VSC has always had the purpose of acting for the benefit of ISU, just as it operates now to own and operate IVS for the College of Veterinary Medicine.

Defendant argues that VSC is also in violation of Iowa's NonProfit Corporation Act. That Act disallows incorporation of non-profit entities if such incorporation is prohibited by another Iowa statute. Iowa Code § 504.301(1)-(2). As discussed above, VSC is not in violation of Iowa's Veterinary Practice Act, and Defendants cite no other statute prohibiting VSC's incorporation. Thus, Defendants argument fails. VSC is lawfully operating a veterinary clinic for the benefit of ISU and its students, and its enforcement of IVS's contractual agreements is reasonably related to that legitimate activity.

### iii. Validity of Non-Competition Agreements

Defendants challenge the validity of Drs. Nestor and Reimer's non-competition agreements on various other grounds. The Court finds each of these arguments to be without merit and concludes that the agreements are valid and binding.

First, Defendants argue that Drs. Nestor and Reimer were fraudulently induced into signing their non-competition agreement because two IVS board members orally promised to sell them the business within five years and because that promise was false. This argument fails because Defendants' reliance on the purported oral promise was unreasonable.

Initially, the Court notes that the non-competition agreements specifically state that they constitute the entire agreement between the parties:

> This Agreement . . . constitutes the entire agreement between the

> parties with respect to the subject matter hereof, and supersedes all prior agreements and understandings, written or oral, between the parties with respect to such subject matter.

(Pl. Exs. 66, 67). "When the parties adopt a writing or writings as the final and complete expression of their agreement, the agreement is fully integrated." *C & J Vantage Leasing Co. v. Wolfe*, 2011 WL 744633, at *16 (Iowa). Looking to the above-quoted language, the Court finds that the parties did intend the writings to be the "final and complete expression of their agreement." (Pl. Exs. 66, 67). And when an agreement is fully integrated, the parol-evidence rule forbids the use of extrinsic evidence introduced solely to vary, add to, or subtract from the agreement." *C & J Vantage Leasing Co.*, 2011 WL 744633, at *16. Accordingly, Defendants are limited to arguing that they were fraudulently induced into signing the contract. *Id.* ("The parol-evidence rule also does not prohibit the admission of evidence to prove fraud in the inducement.").

Under Iowa law, a party claiming fraudulent inducement must prove, among other things, justifiable reliance upon the fraudulent promise or statement. *Vos v. Farm Bureau Life Ins. Co.*, 667 N.W.2d 36, 53 (Iowa 2003) (citing *Lamasters v. Springer*, 99 N.W.2d 300, 302, 304 (1959)); *see also Rubes v. Mega Life & Health Ins. Co.*, 642 N.W.2d 263, 269 (Iowa 2002) (stating that a plaintiff seeking equitable rescission of a contract based on a claim of fraudulent inducement must show (1) a representation; (2) falsity; (3) materiality; (4) an intent to induce action or inaction; and (5) justifiable reliance).

Here, Defendants claim that Drs. Nestor and Reimer signed their non-competition agreements in reliance upon an oral agreement with two IVS board members. The board never voted on this oral agreement, and the parties never agreed upon or even discussed a price for the clinic. Drs. Nestor and reimer did not act as though they already had a contract to purchase the clinic when the learned it was for sale. In fact, members of the IVS board testified that they were entirely unaware of any such promise. In any event, Drs. Nestor and Reimer could not have reasonably relied upon an alleged oral promise like this one.

Because board approval was required to sell IVS and because that approval was never obtained regarding Drs. Nestor and Reimer's purchase of the clinic, Plaintiff correctly argues that

13

this was a mere "agreement to agree." (Reply at 23). And the Iowa Supreme Court has clearly stated that an "agreement to agree to enter into a contract is of no effect unless all of the terms and conditions of the contract are agreed on and nothing is left to future negotiations." *Scott v. Grinnell Mut. Reinsurance Co.*, 653 N.W2d 556, 562 (Iowa 2002) (quoting *Crowe-Thomas Consulting Group, Inc. v. Fresh Pak Candy Co.*, 494 N.W.2d 442, 444-45 (Iowa Ct. App. 1992)) (internal quotations omitted). Even according to the Defendants, almost everything associated with this alleged oral contract was "left to future negotiations," giving no effect to the agreement under Iowa law.

Defendants also contend that Dr. Reimer's non-competition agreement is unenforceable because he was not offered employment following VSC's acquisition of IVS. The Iowa Supreme court has held that "discharge by the employer is a factor opposing the grant of an injunction" on the basis of a non-competition agreement. *Ma & Pa, Inc. v. Kelly*, 342 N.W.2d 500, 502 (Iowa 1984). Ordinarily, this Court would consider this factor to strongly weigh against enforcement of a non-competition agreement, but this case presents a significant, distinguishing fact. From the very beginning of IVS's negotiations with VSC, Dr. Reimer expressed a complete unwillingness to remain at IVS under VSC ownership. Dr. Reimer is therefore unlike the employee-defendant in *Ma & Pa, Inc. v. Kelly*, who was terminated due to a change in market conditions. *Id.* at 501. To have its non-competition agreement enforced, VSC was not required to offer Dr. Reimer employment, knowing he intended to reject it.

Defendants further argue that Dr. Reimer never signed his non-competition agreement and that it is unenforceable as a result. In fact, Dr. Reimer signed an August 1, 2009 Amendment to Employment Agreement that stated in, relevant part:

> 1. This Amendment No.1 was authorized by the mutual consent of the Employer and Employee as of August 1st, 2009.
> . . .
> 3. Section 3.6 is hereby deleted in its entirety and replaced with the following:
> (b) In consideration for entering into the non-competition and confidentiality agreement, attached hereto as Exhibit "A", and as additional consideration for Employee's employment under this Agreement, Employer hereby pays to Employee the amount of $250.00 in cash, receipt of which Employee hereby acknowledges.

(Pl. Ex. 66). Although Dr. Reimer claims that the non-competition agreement was not actually attached, this is contradicted by the above-quoted language of the amendment, which he read before signing.

"Under the doctrine of incorporation, an extrinsic document becomes part of the contract by reference to that document in the contract." *Longfellow v. Sayler*, 737 N.W.2d 148, 154 (Iowa 2007) (*citing Hofmeyer v. Iowa Dist. Ct.*, 640 N.W.2d 225, 229 (Iowa 2001)). The doctrine of incorporation requires that the contract make a clear and specific reference to an extrinsic document in order to incorporate it. *Id.* (citing *Matter of Estate of Kokjohn*, 531 N.W.2d 99, 101 (Iowa 1995)). Here, Dr. Reimer executed Amendment No. 1, which clearly and specifically referenced the non-competition and confidentiality agreement and recited that it was attached to the Amendment. Notably, Dr. Reimer is a sophisticated, well-educated, well-represented individual capable of reading and fully understanding the provisions in the amendment. In fact, Dr. Reimer testified at the hearing that he received $250 for signing to amendment "so it would stick." Accordingly, the Court finds that Dr. Reimer did knowingly intend to incorporate the non-competition agreement into Amendment No. 1 and that the agreement is therefore enforceable.

Next, Defendants argue that, because IVS has only enforced non-competition agreements against Drs. Nestor and Reimer and not other employees, the non-competition agreements have been rendered "meaningless." Defendants cite to *Surgidev Corp. v. Eye Tech., Inc.*, 648 F.Supp. 661, 668-69 (D. Minn. 1986), which applied California rather than Iowa law. However, even if *Surgidev* were binding precedent, it would not apply to this case. The court in *Surgidev* stressed the extent to which the employer "so blithely ignored [non-competition agreements] in the past." *Id.* Because of this, the court found it inequitable to allow the employer to single out the employee after a history of non-enforcement. *Id.* There is hardly a history of non-enforcement in this case. The IVS acquisition was completed on February 1, 2011. If anything, Plaintiff has been quick to enforce its agreements against Drs. Nestor and Reimer, and the VSC CEO, Warren Madden, testified at the hearing that IVS may well bring suit against other employees it believes to be in breach of their non-competition agreements. Defendants' argument on this issue is

15

without merit.

Finally, Defendants argue that the assignment of their non-competition agreements to VSC required Drs. Nestor and Reimer to accept a materially different jobs as compared to their employment with IVS prior to VSC's acquisition. Consequently, they argue that enforcement of the non-competition agreements would be prejudicial. Defendants do not cite any Iowa law to support this argument, and Court also did not find any. Regardless, the evidence does not establish that assignment to IVS materially altered Drs. Nestor and Reimer's obligations under their non-competition agreements, particularly in light of the agreements' assignment provision, discussed above. Accordingly, Drs. Nestor and Reimer are not unfairly prejudiced by the enforcement of those agreements.

Plaintiff has met its burden of showing a likelihood of success on the merits of this lawsuit as to Drs. Nestor and Reimer.

### B. Irreparable Harm and Balance of Harms

Next, the movant must show that it will suffer irreparable harm absent the injunction. *Planned Parenthood Minnesota, North Dakota, South Dakota v. Rounds*, 530 F.3d 724, 732 n.5 (8th Cir. 2008). A movant may show irreparable harm by showing that there is no adequate remedy at law. *Gen. Motors Corp. v. Harry Brown's L.L.C.*, 563 F.3d 312, 319 (8th Cir. 2009). The balance of harms analysis then requires the Court to weight the harm resulting to each party from granting or denying the injunction. *Dataphase*, 640 F.2d at 114. The Court can consider harm to the litigants as well as harm to interested third parties. *Baker Elec.*, 28 F.3d at 1473.

To meet this burden, Plaintiff points to language in the non-competition agreements, which explicitly state that breach will constitute irreparable harm to IVS:

> If Employee breaches any provision hereof . . . Employer will be entitled to temporary and permanent injunctive and other equitable relief including specific performance restraining Employee from committing or continuing such violation and no bond or other security will be required of the plaintiff in connection with any such relief (because immediate and irreparable harm will result from a breach of such provision and any remedy at law for such breach is inadequate and difficult to determine) . . . .

(Pl. Exs. 66, 67). Iowa courts enforce such agreements. *Presto-X-Company v. Ewing*, 442

16

N.W.2d 85, 89 (Iowa 1989) ("[T]he district court should have [issued the injunction] because injunctive relief is part of the remedy that the parties stipulated to in their agreement."), *Hockenberg Equipment Co. v. Hockenberg's Equipment & Supply Co. of Des Moines, Inc.*, 510 N.W.2d 153, 158 (Iowa 1993). Again, the Court notes the sophistication of the parties involved here, which weighs strongly in favor of enforcing their agreement. *Liberty Bank F.S.B. v. Best Litho, Inc.*, 737 N.W.2d 312, 316 (Iowa. App. 2007) (enforcing a forum selection clause where the parties were "sophisticated business people that entered into an arms-length transaction").

Even if the parties had not previously agreed that irreparable harm would result from Defendants' breach, the Court still finds that Plaintiff would suffer irreparable harm absent an injunction. "Irreparable harm can be inferred from a trial court's actual finding of a breach [of a restrictive covenant] by the defendant." *Overholt Crop Ins. Service Co. v. Travis*, 941 F.2d 1362, 1371 (8th Cir. 1991) (quotation omitted). The Court has found exactly this kind of breach, discussed above. Moreover, both Drs. Reimer and Nestor testified that they took out a large amount of debt to fund IVRC and that they will be forced to file for bankruptcy if the Court grants Plaintiff's motion for injunctive relief. (Resistance at 44). Accordingly, it is reasonable to conclude they are largely judgment-proof. Therefore, a legal remedy in favor of Plaintiff would be inadequate. *See PFS Distribution Co.*, 332 F.Supp 2d at 1251 (concluding that defendant's lack of unpledged assets counsels in favor of injunctive relief).

Arguing that the balance of harms analysis weighs in favor of denying injunctive relief, Defendants note that a preliminary injunction will likely result in their filing for bankruptcy – a significant harm to both Defendants and their employees. The Court acknowledges this but also notes that Defendants were aware of their non-competition agreements with IVS and were certainly in a position to obtain competent legal advice regarding their decision to compete with IVS in breach of those agreements. Defendants harm is self-inflicted.

IVS also faces significant harm absent an injunction, evidenced by its revenue decline since IVRC's opening. Accordingly, the Court finds that the balance of harms also weighs somewhat in favor of issuing the injunction.

### C. Public Interest

Lastly, the Court considers whether the public interest would be served by granting

Plaintiff's motion for injunctive relief. *Dataphase*, 640 F.2d at 113. First, the enforcement of valid non-competition agreements serves the public interest. *N.I.S. Corp. v. Swindle*, 724 F.2d 707, 710 (8th Cir. 1984) ("[I]f these noncompete agreements are valid, the public interest calls for their enforcement."). Additionally, ISU has invested significant public funds into expanding its veterinary program through its purchase of IVS. ISU paid a premium for IVS with the reasonable expectation that they were purchasing valid, enforceable agreements as part of a viable commercial entity from the then-shareholders of IVS, and the public has an interest in ISU getting the benefit of its bargain.

Defendants argue that the public interest is served by greater competition in the Des Moines specialty veterinary market and by the inclusion of a private option for Des Moines pet owners. This may be true, but it is ameliorated by the reasonable two-year limitation in Drs. Nestor and Reimer's non-competition agreements and further by ISU's mission of training new veterinarians in specialty practice. The Court finds the public interest factor to weigh in favor of an injunction against Drs. Reimer and Nestor.

## IV. CONCLUSION

Plaintiff has not shown a sufficient likelihood of success on the merits with regard to Mr. Hanika. Because this is the most significant *Dataphase* factor, and because the other factors do not overwhelmingly favor an injunction on their own, the Court denies Plaintiff's motion for injunction relief as it relates to Mr. Hanika.

On the other hand, Drs. Nestor and Reimer had valid non-competition agreements with IVS. They were highly compensated, very well-educated, and certainly capable of obtaining legal advice before and after signing those agreements. They are clearly in breach of those agreements, giving VSC great likelihood of succeeding on the merits their claim. In those non-competition agreements, Drs. Nestor and Reimer agreed that VSC would suffer irreparable harm if the agreements were breached, and it is certainly in the public interest that such agreements are enforced. A balancing of all *Dataphase* factors compels the conclusion that Plaintiff is entitled to preliminary injunctive relief against Drs. Nestor and Reimer.

Upon the foregoing,

**IT IS ORDERED** that Plaintiff's motion for a preliminary injunction [Dkt. No. 2] is

granted as to Drs. Nestor and Reimer and denied as to Mr. Hanika. Drs. Nestor and Reimer are enjoined from competing with IVS within following Iowa counties: Polk County, Dallas County, and Warren County.

**IT IS FURTHER ORDERED** that Plaintiff shall post a bond in the amount of $2,000,000 from an approved surety or a binding representation from ISU that it will pay any judgment against the Plaintiff herein.

**DATED** this 27th day of April, 2011.

JOHN A. JARVEY
UNITED STATES DISTRICT JUDGE
SOUTHERN DISTRICT OF IOWA